# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:22-cv-00265-MR-WCM

| | |
|---|---|
| **DEANA HOSIE,** )<br>)<br>**Plaintiff,** )<br>)<br>**vs.** )<br>)<br>)<br>**OMNI HOTELS MANAGEMENT** )<br>**CORPORATION,** )<br>)<br>**Defendant.** )<br>_____ ) | **MEMORANDUM OF**<br>**DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Defendant's Renewed Motion for Judgment as a Matter of Law, or, Alternatively for a New Trial. [Doc. 95].

## I.    PROCEDURAL BACKGROUND

On November 30, 2022, the Plaintiff Deana Hosie ("Plaintiff") filed this action in Buncombe County Superior Court against the Defendant Omni Hotels Management Corporation ("Defendant").[1]  [Doc. 1-1].  The Defendant

---

[1] The Court notes that the Plaintiff initially filed this case in Buncombe County Superior Court in November 2020, and the Defendant removed the case to this Court in December 2020.  Hosie v. Omni Hotels Mgmt. Corp., 1:20-cv-00374-MR-DSC, 2021 WL 5826787, at *1 (W.D.N.C. Dec. 8, 2021).  On December 8, 2021, this Court dismissed the Plaintiff's case without prejudice after the Plaintiff failed to comply with discovery deadlines.  Id. at *1, *4.

removed the action to this Court on December 21, 2022, based on diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441(b), and 1446. [Doc. 1]. In her Complaint, the Plaintiff alleges that, on November 17, 2017, while dining at the Defendant's buffet-style restaurant located at the Grove Park Inn (the "Grove Park") in Asheville, North Carolina, the Plaintiff tripped over a box-shaped object on the floor and fell, causing her serious injuries. [Doc. 1-1]. On December 27, 2022, the Defendant filed an Answer and Affirmative Defenses to the Plaintiff's Complaint. [Doc. 3].

On June 12, 2024, the Defendant filed a Motion for Summary Judgment. [Doc. 39]. On August 26, 2024, after determining that genuine issues of material fact were present in this case, the Court denied the Defendant's Motion for Summary Judgment by Text Order. On September 12, 2024, the Defendant filed a Motion for Reconsideration, asking the Court to reconsider its ruling denying the Defendant's Motion for Summary Judgment. [Doc. 53]. The Court orally denied the Defendant's Motion for Reconsideration at the pretrial conference held on December 19, 2024.

The case proceeded to trial on January 21, 2025. Upon conclusion of the Plaintiff's evidence, the Defendant moved for the entry of judgment as a matter of law, which the Court denied.

On January 23, 2025, following the conclusion of the evidence and closing arguments made by the parties, the Court delivered to the jury a set of instructions and presented the jury with a verdict sheet setting forth three (3) issues. The jury deliberated from approximately 10:39 a.m. to 12:15 p.m. [Doc. 99 at 62-63]. Upon returning to the courtroom, the foreperson of the jury confirmed that the jury had reached a verdict and that the verdict was unanimous among the jurors. The jury answered the issues on the Verdict Sheet as follows:

1. Was the Plaintiff Deana Hosie injured by the negligence of the Defendant Omni Hotels Management Corporation?

   Answer:    Yes

2. Did the Plaintiff, by her own negligence, contribute to her injury?

   Answer:    No

3. What amount of damages, if any, is the Plaintiff entitled to recover as a direct result of the actions of the Defendant?

   Answer:    $500,000[2]

---

[2] During the Plaintiff's closing argument, the Plaintiff's counsel asked the jury to return a verdict in favor of the Plaintiff and to award the Plaintiff double the amount of the Plaintiff's medical bills and lost wages, which combined to $110,000.00, for a total of $220,000.00 in damages. The Defendant does not contest the jury's calculation of damages, only its determination of the Defendant's liability.

[Docs. 90, 94]. After the Court announced the verdict, the Defendant's counsel requested to poll the jury. Each juror assented to the verdict as announced by the Court.

On February 24, 2025, the Defendant filed the present Motion for Judgment as a Matter of Law and alternative Motion for a New Trial. [Doc. 95]. The Plaintiff filed a Response to the Defendant's Motion on March 11, 2025. [Doc. 100].[3] The Defendant filed a Reply to the Plaintiff's Response on March 18, 2025. [Doc. 101]. This matter is ripe for disposition.

## II. STANDARDS OF REVIEW

### A. The Defendant's Motion for Judgment as a Matter of Law

A district court may grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1)(B). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal issues raised by the motion." Fed. R. Civ. P. 50(b). "No later than 28 days after the entry of judgment . . . , the

---

[3] The Plaintiff filed an amended Response on June 24, 2025, to correct citations to the trial transcript. [Doc. 105]. The Defendant did not object to such filing. [Doc. 102 at 2].

4

movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Id. "In ruling on the renewed motion," the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Id.

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, a court may grant a judgment as a matter of law "if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998) (citing Fed. R. Civ. P. 50(b)). A court must deny a motion for judgment as a matter of law if, "giving the non-movant the benefit of every legitimate inference in his favor, there was evidence upon which a jury could reasonably return a verdict for him." Id. (quoting Abasiekong v. City of Shelby, 744 F.2d 1055, 1059 (4th Cir. 1984)). In making such a determination, the court cannot re-weigh the evidence or the credibility of the witnesses; rather, the court must "assume that testimony in favor of the non-moving party is credible, 'unless totally incredible on its face,' and ignore the substantive weight of any evidence supporting the moving party." Id. (quoting Duke v. Uniroyal, Inc., 928 F.2d 1413, 1419 (4th Cir. 1991)).

## B.    The Defendant's Alternative Motion for New Trial

Under Rule 59 of the Federal Rules of Civil Procedure, a district court may set aside a verdict and grant a new trial if the court is of the opinion that a verdict (1) "is against the clear weight of the evidence"; (2) "is based upon evidence which is false"; or (3) "will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."  Atlas Food Sys. and Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996) (quoting Aetna Cas. & Sur. Co. v. Yeatts, 122 F.2d 350, 352-53 (4th Cir. 1941)); Fed. R. Civ. P. 59(a)(1) (stating that a court may set aside jury verdict "for any reason for which a new trial has heretofore been granted in an action at law in federal court").

In reviewing a motion for new trial, the court is permitted to weigh the evidence and consider the credibility of the witnesses.  Cline, 144 F.3d at 301.  The decision to grant or deny a new trial is a matter within the district court's sound discretion.  See id.

## III.    FACTUAL BACKGROUND

Viewing the evidence presented at trial in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

The week before Thanksgiving marks the beginning of the Grove Park's busiest season.  [Doc. 97 at 162].  During that week, on November

17, 2017, the Plaintiff dined at a buffet-style restaurant (the "Blue Ridge Dining Room") at the Grove Park while on vacation with a bus tour group. [Id. at 54]. The layout of the Blue Ridge Dining Room is depicted here:



[Doc. 93 Def-6: Layout of Blue Ridge Dining Room].

The Plaintiff arrived at the Blue Ridge Dining Room with her tour group around 5:30 p.m. [Doc. 98 at 23]. The group entered the Blue Ridge Dining Room near the host stand as shown at the bottom-left corner of the diagram of the restaurant as shown above, and were subsequently seated at tables 211, 212, 213, 221, 222, and 223 in the Water Rock Room. [Id. at 22; Doc. 93 Def-6: Layout of Blue Ridge Dining Room]. To reach the Water Rock Room, the group walked from the host stand through the lobby area and past the Pisgah Room, through the room dedicated to the cold food section of the buffet, through the room dedicated to the hot food section of the buffet, and,

7

finally, through the Chimney Rock Room. [Doc. 97 at 56; Doc. 93 Def-6: Layout of Blue Ridge Dining Room].

The Blue Ridge Dining Room became progressively more crowded as the tour group ate dinner. [Doc. 97 at 57]. At some point during dinner, the Plaintiff announced that she needed to use the restroom, and another member of the tour, Ann, asked to join.[4] [Id.]. Ann and the Plaintiff walked through the Chimney Rock Room, through the hot food section of the buffet, and through the cold food section of the buffet, on their way to the bathroom at the entrance of the restaurant. [Id. at 57-58]. When the two reached the lobby/dessert area, however, Ann abruptly stopped. [Id. at 57-58; Doc. 93 Def-6: Layout of Blue Ridge Dining Room]. When the Plaintiff realized that Ann had fallen behind, the Plaintiff turned around to ask Ann if she needed help. [Doc. 97 at 58]. Ann responded that she felt as though she would be sick and told the Plaintiff that she needed to sit down. [Id.]. As more people came into the lobby of the Blue Ridge Dining Room, the Plaintiff and Ann entered the Pisgah Room so Ann could sit. [Id.].

There is one large entrance and one small entrance at the front of the Pisgah Room, and a door at the back of the room. [Doc. 93 Def-6: Layout of Blue Ridge Dining Room; Doc. 97 at 112]. That evening, a planter blocked

---

[4] Ann passed away prior to trial. [Id. at 67].

8

off the small entrance [Doc. 97 at 211], and a long, rectangular dessert buffet table (the "buffet table") sat in the lobby of the Blue Ridge Dining Room in front of the large entrance to the Pisgah Room [id. at 59].[5]  Several smaller round tables sat inside the Pisgah Room, some dressed in napkins and silverware, and others not.  [Doc. 97 at 58].  Staff came in and out of a door at the back of the Pisgah Room to serve cocktails to patrons assembled in the back of the room.  [Id. at 58-59, 61, 112].

Ann and the Plaintiff walked around the buffet table and sat down at an undressed round table near the large entrance to the Pisgah Room.  [Id. at 58].  After the two sat down, Ann told the Plaintiff that she felt as though she was going to vomit and asked the Plaintiff to grab a napkin off of a different, dressed round table further inside the Pisgah Room.  [Id.].  As the Plaintiff walked from the undressed round table to the dressed round table, the Plaintiff tripped over an object and fell into a pillar [id. at 58], causing the Plaintiff to break her arm [id. at 71].

After the Plaintiff fell, and before any of the Defendant's employees arrived at the Pisgah Room, the Plaintiff sat in a chair and looked to see what

---

[5] The buffet table was measured to be approximately 30 inches wide, 103 inches long, and 36 inches tall.  [Doc. 98 at 92].  The large entrance to the Pisgah Room was measured to be approximately 139 and one-quarter inches long and 94 and one-quarter inches tall. [Id. at 91].

object she had tripped over.  [Id. at 63].  The Plaintiff noticed a square, black, unilluminated box lamp (the "box lamp") on the floor in the vicinity of the round tables.  [Id.; Doc. 93 Def-2: Omni incident report, 11/17/17].

The Defendant's employees use box lamps for ambiance in the Blue Ridge Dining Room, and to illuminate items on buffet tables.  [Doc. 98 at 87, 91].  William Bierlien, the executive chef of the Blue Ridge Dining Room [Doc. 97 at 160],[6] testified that whenever any box lamp is present in the Blue Ridge Dining Room, it is because one of the Defendant's employees had placed it there [id. at 171].  Bierlien further testified that, early in the day on November 17, 2017, he had placed the box lamp in the position as depicted in a photograph taken by Luke Francis, a loss prevention officer, after the incident.  [Id. at 205-06; Doc. 93 Def-7-c: Picture of Table and Box Light; Doc. 93 Def-2: Omni incident report, 11/17/17].  Luke Francis's photograph depicts the buffet table just in front of the large entrance to the Pisgah Room, as well as the box lamp underneath the buffet table, and is shown here:

[6] The Court refers to each witness's job title as of November 17, 2017.



[Doc. 93 Def-7-c: Picture of Table and Box Light; Doc. 93 Def-2: Omni incident report, 11/17/17 at 3].

Anna Davis, the food and beverage manager at the Blue Ridge Dining Room [Doc. 98 at 9], and Curt Davis, a resort manager at the Grove Park [id. at 119], both testified that when they arrived at the Pisgah Room after the Plaintiff was injured, the box lamp and the buffet table appeared exactly as

they appear in Luke Francis's photograph. [Id. at 84, 135; Doc. 93 Def-7-c: Picture of Table and Box Light].

Luke Francis did not recall the manner in which the box lamp and the buffet table were set up when he arrived at the scene after the Plaintiff fell. [Doc. 98 at 181]. He did testify, however, that there was a table at the front of the room, and that the light appeared to be under the table. [Id. at 170-71]. Francis further testified that he took the photograph to depict where the Plaintiff told Francis that she had fallen. [Id. at 185].

Finally, the Plaintiff testified that Francis's photograph did *not* depict the position of the box lamp when she "turned around after hitting th[e] wall and looked on the floor." [Id. at 145]. Rather, according to the Plaintiff, the lamp sat in the path between the undressed round table where her and Ann initially sat, and the dressed round table that the Plaintiff walked towards to retrieve a napkin. [Id.; Doc. 97 at 66].

Soon after the Plaintiff fell, Luke Francis arrived at the scene to assist the Plaintiff and to call Emergency Medical Services ("EMS"). [Doc. 97 at 67-68; Doc. 98 at 168]. When EMS arrived, Emergency Medical Technicians ("EMTs") walked around the buffet table into the Pisgah Room with a stretcher to assist the Plaintiff. [Doc. 98 at 146]. Luke Francis photographed the scene at some point after the EMTs left the Pisgah Room with the

Plaintiff, and later prepared an Incident Report to document the circumstances of the fall. [Id. at 172, 187; Doc. 93 Def-2: Omni incident report, 11/17/17].

According to Francis's Incident Report, Francis arrived at the Pisgah Room at 6:10 p.m., EMS arrived at 6:22 p.m., and EMS left the Blue Ridge Dining Room with the Plaintiff at 6:44 p.m. [Doc. 93 Def-2: Omni incident report, 11/17/17]. Based on the Defendant's Security Log from the night of November 17, 2017, Francis did not submit the Incident Report until 9:22 p.m. [Doc. 93 Pla-19: OMNI GPI Security Log 11/17/2017 at 3].

From this factual background, the Defendant moves for judgment as a matter of law and, alternatively, a new trial.

## IV. DISCUSSION

"Under North Carolina law, a common law claim of negligence has three elements: (1) a legal duty owed by the defendant to the plaintiff; (2) a breach of that legal duty; and (3) injury proximately caused by the breach." Kritter v. Mooring, 142 F.4th 267, 273 (4th Cir. 2025) (citing Keith v. Health-Pro Home Care Servs., Inc., 381 N.C. 442, 450, 873 S.E.2d 567, 574 (2022)). Landowners have a duty to exercise "reasonable care toward all lawful visitors." Nelson v. Freeland, 349 N.C. 615, 631, 507 S.E.2d 882, 892 (1998). To prove that a defendant-landowner breached a duty owed to a

lawful visitor, the visitor "must show that the defendant either (1) negligently created the condition causing the injury, or (2) negligently failed to correct the condition after actual or constructive notice of its existence." Roumillat v. Simplistic Enters., Inc., 331 N.C. 57, 64, 414 S.E.2d 339, 342-43 (1992) (citation omitted).

With this framework of North Carolina premises liability law, the Court will address the Defendant's Motion for Judgment as a Matter of Law and the Defendant's alternative Motion for New Trial in turn.

## A. The Defendant's Motion for Judgment as a Matter of Law

Following the parties' closing arguments, the Court instructed the jury on the law of negligence and premises liability. Specifically, the Court instructed the jury that a property owner "has no legal duty to warn of obvious dangers or conditions," but does have "a legal duty to give adequate warning to lawful visitors of any hidden or concealed dangerous condition about which the property owner knows or, in the exercise of ordinary care, should have known that a lawful visitor would reasonably be expected to encounter." [Doc. 99 at 49]. The Court further instructed the jury that "[a] property owner is held responsible for knowing of any condition which a reasonable inspection and supervision of the premises would reveal and is also responsible for knowing of any hidden or concealed dangerous condition

which conduct of its agents or employees created." [Id. at 50]. Given these instructions, the jury unanimously found that the Defendant negligently caused the Plaintiff's injury but that no contributory negligence on the part of the Plaintiff caused such injuries.

The Defendant's Rule 50 arguments focus on the box lamp: the placement of the box lamp, whether the Defendant's employees knew or should have known that the position of the box lamp constituted a hazardous condition, and whether the position of the box lamp constituted an open and obvious condition. For the jury to have reasonably found that the Defendant acted negligently with regard to the box lamp, there must have been sufficient evidence presented at trial that (1) the box lamp was not open and obvious; and (2) either one of the Defendant's employees placed the box lamp in the spot where the Plaintiff tripped and fell, or the Defendant's employees knew or should have known of that the alleged dangerous condition that caused the Plaintiff's injury, or the Defendant's employees failed to conduct reasonable inspections and this failure caused the Plaintiff's injury. The Court will address each of these requirements in turn.

### 1.    Open and Obvious Condition

"[A] landowner has a duty to warn visitors of any hidden danger on its property of which the landowner should be aware.  A landowner does not, however, have a duty to warn anyone of a condition that is open and obvious." Draughon v. Evening Star Holiness Church of Dunn, 374 N.C. 479, 483, 843 S.E.2d 72, 76 (2020) (citations omitted).  Thus, if a condition that causes a visitor's injury is open and obvious, a landowner cannot legally be found to have acted negligently.  "A condition is open and obvious if it would be detected by any ordinarily intelligent person using his eyes in an ordinary manner." Id. (internal quotation marks and citation omitted).   In North Carolina, although negligence is typically a question of fact best resolved by a jury, when a "condition that allegedly caused the injury, viewed objectively, is open and obvious, judgment as a matter of law is appropriate." Id. at 482-83, 843 S.E.2d at 76 (citation omitted).

In arguing that the box lamp constituted an open and obvious condition that the Plaintiff should have seen, the Defendant relies on the Plaintiff's testimony in response to two certain lines of questioning, elicited during the Defendant's cross-examination of the Plaintiff at trial.  [Doc. 96 at 17-18].  The exchanges between the Defendant's counsel and the Plaintiff are as follows:

Q.     (By [Defense counsel])  So you said that after the happening of the accident you kind of turned over to look to see what was in the area where you had fallen; is that right?

A.     No.  I said that I got up off the ground and noticed that my arm did not look right.

Q.     Okay.

A.     And then I sat down on a chair and then I saw the box that I fell over.

Q.     And the chair you sat down in, how far was it away from the box that you think you may have fallen over?

A.     I do not recall.  I got up and pulled the chair out from the table and I sat down.

Q.     Okay.  From wherever it was that you were sitting, could you see the box?

A.     At that point in time, yes.

. . . .

Q.     It was open to you, yes?

A.     Yes.

Q.     It was obvious to you, yes?

A.     Yes.

[Doc. 97 at 137-38].  Then, on the following day of trial:

Q.     So, Ms. Hosie, if I understand what you're saying, right after your accident when you turned

around and actually looked in the area where you had been walking, you could clearly see the lamp?

A.     Yes.  After I got up and sat down on the chair and looked to see what happened, I saw the lamp on the floor that I must have tripped over.

Q.     Okay.  So[,] you could see it from a seated position.  You said you were in a chair so you could see it from a seated position?

A.     Yes.  I sat down after I saw the injury on my arm, yes.

Q.     And could you also see it from a standing position?

A.     I did not see it when I was walking.  I saw it after the fact.

Q.     I didn't ask you about when you were walking. We all know you didn't see it when you were walking. What I'm asking you is:  After the happening of the accident, as you stood up and turned around, could you see the lamp?

A.     I stood up and sat right down in a chair.  I didn't, like, turn around.  I stood up and was facing the right way so I sat down and there it was.

Q.     There it was.  Plain as day.

A.     Right in between the tables.  Yes, sir.

Q.     Easy to see?

A.     At that moment after the fact, yes.

[Doc. 98 at 145-46].

Relying on the above-quoted testimony that the Plaintiff saw the box lamp *after* she fell, the Defendant argues that the box lamp was open and obvious to the Plaintiff *before* she fell.  What the Plaintiff saw from a seated position after she fell, however, does not conclusively dictate what the Plaintiff should have seen as she navigated around one round table to another.  See <u>Yates v. Haley</u>, 103 N.C. App. 604, 607-08, 406 S.E.2d 659, 661-62 (1991) (determining a question of fact existed where a customer at a restaurant stated that a puddle was "obvious" to him when he sat on the ground after he fell, but was not obvious to him beforehand because his view had been "partially obstructed by the booths in the area").  The evidence reasonably raises an inference that the Plaintiff's view of the box lamp was obstructed as she navigated between the two round tables and, thus, that a reasonable person in the Plaintiff's position would not have seen the box lamp.  In other words, the evidence that the box was obvious from one vantage point does not conclusively prove that it was obvious from the Plaintiff's perspective while walking between the tables.

Therefore, the Court concludes that, notwithstanding the Plaintiff's responses on cross-examination, sufficient evidence was presented for a reasonable jury to find that the box lamp did not constitute an open and obvious condition.

## 2. Placement of the Box Lamp

The Defendant argues that there was not sufficient evidence presented at trial for the jury to find that one of the Defendant's employees either placed the box lamp in a hazardous position, or knew or should have known the position of the box lamp constituted a hazardous condition.[7]

As explained above, one of the Defendant's employees, William Bierlien, testified that he placed the box lamp underneath the buffet table as depicted by Luke Francis's photograph. [Doc. 97 at 205-06]. Other employees testified that they recalled seeing the box lamp in said position on November 17, 2017. [Doc. 98 at 84, 135, 170-71]. Yet, the Plaintiff testified that the box lamp was not in the position as depicted on Luke Francis's photograph. [Id. at 145].

Relying on its employees' testimony regarding the placement of the box lamp underneath the buffet table, the Defendant argues that there is no evidence that one of the Defendant's employees placed the box lamp in the position that the Plaintiff claims to have tripped over it—*i.e.*, between the round tables. [Doc. 96 at 5-9]. Thus, according to the Defendant, there is

---

[7] Because the Court concludes that sufficient evidence was presented at trial as to each of these issues, the Court will not address the Defendant's argument regarding whether sufficient evidence was presented at trial that the Defendant failed to conduct reasonable inspections.

no evidence from which a reasonable jury could conclude that the Defendant created the hazardous condition that caused the Plaintiff's injury.  [Id. at 8-9].

This issue, however, is ultimately one of credibility for the jury to weigh and to determine how to synthesize the apparently conflicting evidence.  The Defendant's employees testified that the box lamp was in one place, the Plaintiff testified that it was in another.  The Court carefully instructed the jury as to how to evaluate the credibility of the witnesses, including the multiple factors that go into such evaluation.[8]  [Doc. 99 at 42].  The jury apparently accepted Bierlien's testimony that he placed the light box but discounted his testimony as to *where* he placed it, instead accepting the Plaintiff's version of where it was.  Likewise, the jury discounted each employee's testimony of where they perceived the box lamp when they arrived at the scene of the fall.[9]  It is not for the Court, on a Rule 50 Motion, to re-weigh the credibility of

---

[8] Among the things that the Court instructed the jury to consider in evaluating the credibility of the witnesses were: (1) whether the witness has any motive or reason to be truthful or untruthful; (2) his or her interest, if any, in the outcome of the case; (3) whether his or her attitude or conduct showed bias, prejudice or influence; (4) whether his or her testimony bears the earmarks of truthfulness; (5) to what extent, if any, the testimony is corroborated by other testimony which is not questioned, or by known or admitted facts; (6) the intelligence and mental capacity of the witness; and (7) his or her opportunity to have accurate knowledge of the matters to which he or she testified.  [Doc. 99 at 42].

[9] Clearly, the jury discounted Francis' photograph of the location of the light box and table.  See § IV.B.1, *infra.*

the witnesses.  See Cline, 144 F.3d at 301.  The Court concludes that there was evidence presented to support the jury's determination that the box was placed by employees of the Defendant in a dangerous location.  The Defendant's Rule 50 Motion is therefore denied.

## B.    The Defendant's Alternative Motion for New Trial

The Defendant presents two arguments as to why it is entitled to a new trial.  First, the Defendant recasts its Rule 50 argument, asserting that it is entitled to a new trial because the verdict was against the clear weight of the evidence as to the Defendant creating a hazardous condition.  [Doc. 96 at 21].  Second, the Defendant argues that the overwhelming evidence shows that the Pisgah Room was not open to guests and, therefore, it did not owe the Plaintiff any duty of care in the Pisgah Room.  [Id. at 21-25].

## 1.    Placement of the Box Lamp

At trial, the Defendant heavily relied on Luke Francis's photograph to corroborate its employees' testimony regarding the location of the box lamp and the buffet table.  The jury, however, ultimately discounted the accuracy of the photograph and the Defendant's employees' testimony regarding the photograph and inferred that the box lamp was moved before Francis took the photograph.  As noted, *supra*, the jury also discounted the Defendant's

22

testimony regarding where Bierlien placed the box lamp and where the employees saw the box lamp.

The evidence supports the jury's determinations. As stated above, when EMS responded to the Plaintiff's fall, EMTs walked around the buffet table to enter the Pisgah Room, where they stayed for twenty-two minutes, then walked back around the buffet table to carry the Plaintiff out of the Pisgah Room on a stretcher, all before Francis photographed the scene.[10] [Doc. 98 at 146, 172, 187; Doc. 93 Def-2: Omni incident report, 11/17/17]. Based on the measurements stipulated to by the parties [Doc. 98 at 91-92], the large opening to the Pisgah Room is only thirty-six inches larger than the buffet table, meaning that, even if the table was pressed against one side of the large opening, the EMTs would only have had a three-foot path to maneuver in and out with a stretcher. Additionally, the Plaintiff testified that Luke Francis's photograph does not accurately represent the position of the buffet table when the Plaintiff entered the Pisgah Room. [Doc. 97 at 121].

---

[10] There was conflicting evidence presented at trial regarding whether EMTs actually entered the Pisgah Room with a stretcher. Regardless of whether EMTs entered the Pisgah Room with a stretcher, however, it is reasonable to infer that people came in and out of the Pisgah Room to assist the Plaintiff. It is also reasonable to infer that the buffet table did not sit in the position as shown in the photograph contained in the Incident Report, because it would be difficult for these people to maneuver around the buffet table as seen in said photograph.

23

Based on this evidence, the jury could have reasonably inferred that the EMTs would not have been able to maneuver around the buffet table as shown in photograph contained in the Incident Report to take the stretcher into the Pisgah Room to retrieve the Plaintiff. Taken one step further, it was also reasonable for the jury to infer that the table did not sit in the position as shown in Francis's photograph when the Plaintiff entered the Pisgah Room, and that Francis, a loss prevention officer, rearranged the buffet table and the box lamp to a different position before photographing the scene. For these reasons, the Court concludes that the jury's determinations did not go against the clear weight of the evidence.

## 2. The Pisgah Room

The Court instructed the jury that a property owner "has no legal duty to take precautions . . . against lawful visitors from straying into areas where they would not reasonably be expected to go." [Doc. 99 at 49].

The Defendant contends that the clear weight of the evidence shows that it did not owe the Plaintiff any legal duty inside the Pisgah Room. In much of its argument, the Defendant focuses on its employees' subjective knowledge of the regular use of the Pisgah Room. For example, the Defendant points out its employees' testimony that the Pisgah Room was only used during the busiest times of year and on special occasions, as the

24

Pisgah Room did not provide "a great customer experience." [Doc. 96 at 22-23 (citing Doc. 97 at 165, 198-199; and Doc. 98 at 41-42)]. Whatever background knowledge that the Defendant's employees may have had about the regular usage of the Pisgah Room, however, is of little consequence when determining the *Plaintiff's* reasonable expectations on the evening of November 17, 2017. The Plaintiff had never been to the Grove Park. [Doc. 97 at 104]. Nobody told the Plaintiff that the Pisgah Room was off limits. [Id. at 62]. The Defendant's employees did not place any signs or ropes to indicate that the Pisgah Room was off limits.[11] [Id. at 60-61].

Additionally, William Bierlien testified that the week before Thanksgiving marks the start of the busiest time of year at the Grove Park [id. at 162], implying that the Pisgah Room may have been in use on November 17, 2017. The inference that the Pisgah Room was in use on the day in question is further supported by the Plaintiff's testimony that other patrons were gathered in the Pisgah Room at the time that she fell. [Id. at 58-59, 61]. Finally, there was evidence presented at trial that some of the tables were dressed with napkins and silverware. [Id. at 58]. It is reasonable

---

[11] The Defendant's employees purportedly used the buffet table for this purpose, but considering the conflicting testimony surrounding the placement of the buffet table, and how EMS may have moved the buffet table to enter the Pisgah Room with a stretcher, the position of the buffet table when the Plaintiff entered the Pisgah Room is unclear.

for a patron at a buffet to assume that an area in which tables are dressed with napkins and silverware is an area that patrons may enter.

The gist of the Defendant's argument is that it had strong and substantial evidence in its favor. That, of course, is why this case went to trial. The Plaintiff also had sufficient evidence to take this case to the jury. The jury apparently believed the Plaintiff's evidence.

For the foregoing reasons, the Court concludes that the jury's determination that the Defendant owed the Plaintiff a legal duty inside the Pisgah Room was not against the clear weight of the evidence.

## V. CONCLUSION

During the Plaintiff's closing argument, the Plaintiff's counsel argued that the Defendant's employees misrepresented what they remembered from the night of November 17, 2017, and highlighted the employees' potential motivations for doing so. The jury unanimously agreed.

When viewed in the light most favorable to the Plaintiff, the evidence presented at trial, along with inferences drawn therefrom, produced a legal path by which a reasonable jury could find in favor of the Plaintiff. Further, with the abundance of conflicting facts, the jury weighed the credibility of the witnesses to reach a reasonable verdict in this case. For these reasons, the

Defendant's Motion for Judgment as a Matter of Law and alternative Motion for a New Trial are denied.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Renewed Motion for Judgment as a Matter of Law, or, Alternatively for a New Trial [Doc. 95] is **DENIED**.

**IT IS SO ORDERED.**

Signed: August 4, 2025

Martin Reidinger
Chief United States District Judge